case did not adequately charge the mail fraud, bribery, and gratuities violations, or racketeering crimes alleged, and that the evidence did not establish those crimes. The essence of the government's charge was a scheme to defraud through a rigged hiring scheme, hiring or promoting persons for positions in the probation service who were recommended or sponsored by members of the Massachusetts legislature when those persons were not the most qualified, in quotes, applicant. There was no evidence that Mr. O'Brien received any money or gifts in exchange for jobs. There was no allegation that any person he hired was not qualified for the position they received. There was nothing in the indictment to define how the most qualified person should or would be determined, or indeed who the most qualified person was for any particular position. We suggest that this is a case of using the federal mail fraud and racketeering statutes to go beyond the bounds that concerned the Supreme Court most recently in McDonnell, previously in Skilling in Cleveland, this court in Zubinski, and the Seventh Circuit in Bogorodich. It is a case in which, as the Supreme Court recently said in McDonnell, the federal government has tried to set standards of good government for local and state officials. But the Federal Criminal Code is not designed to set political standards for state government. This case is essentially about political influence in hiring. And whatever your views of that are, it is not, as the district court instructed the jury both in opening instructions and in its closing instructions, it is not a crime. Rather, it is a matter that we suggest should be left to the state to address. Mr. Pesnozzi, what about the language in the allegation? The allegation is everything you've said so far is actually true. Patronage hiring is not a crime. To put you on the side of the gratuitous point, it became a crime though when Mr. O'Brien gave a letter to Justice Mulligan certifying that the applicant had been selected under certain criteria when, in fact, the applicant had not been selected. So that's full bashing by O'Brien on Justice Mulligan. Well, we, first of all, disagree with the government's characterization of the certification as it's described in the indictment. If you actually look at the certification itself, which is set out in our brief at page 49, and in the reply brief, the certification is part of a particular section of the trial court manual. Right. If you read that narrowly, then it would necessarily be false. That's correct. But if you read it broadly to refer to all section, what does it fall from the OOO? If you read it as a court reading, then doesn't that say that the government's case is down to saying that there was a false statement that was supposedly material to Mulligan? Well, the certification is what the government is claiming is the material misrepresentation. We're suggesting first that it is not a misrepresentation because there is no reason for reading that section more broadly. And, in fact, the Supreme Judicial Court, in addressing personnel standards, that's personnel standards is used only, that phrase is used only in section 4.400. And in addressing that in first justice, the Supreme Judicial Court discussed it in terms of the administrative requirements that are set out in 4.400. But it can't be referred to those administrative statements in 4.400 grammatically. It's clearly in 4.400 referring to personnel standards outside that section. Because it goes on to say private personnel standards and you're going to submit the following administrative materials. I think that the personnel standards are what is contained in those administrative materials. That those are the reflection of the personnel standards that have to be defined. Is that a legal point or a factual point? I think it's both. It's an interpretation of... So the interpretation of what the personnel standards represent, that I think would be just a legal question, right? That's just what it may be. Yes, it was. And then the actual question is, what did the person who gave the certification think about? And that would be a question of Mr. O'Brien's intent. That would be factual. That would be a factual question. And then the jury would be free and resilient to conclude, we think he intended it to be the wrong thing. There is not any evidence in the record to support... No, there's no evidence against it. Given that if you're right, there's an ambiguity about it. And so it legally could be the wrong thing. What would more have to be in the record for a jury to have a reason to infer that we think, given the whole context of things, he intended it to be the wrong thing? That he was attempting to deceive Judge Mulligan? First of all, you have a pattern and practice in which hiring in the... Judge, I didn't mean to say that. Not whether he was attempting to deceive Judge Mulligan. Was he intending to make a false statement? Regardless of whether Justice Mulligan believed it to be false or not. I don't think there is any evidence that he was intending... What more would there need to be for a jury to determine that? You can read this broadly, you can read it narrowly. We think he must have, in context, meant it broadly. Telling someone that he is... I understand personnel standards to include this objective of hiring, which, again, is not even a standard. 4.000 says it is the objective of a hiring... No, yes, but it was just focused on nepotism. And there was no nepotism involved in these hires. And I think that's a distinction with Anzalone, which was also decided after Mr. O'Brien left the probation service. But that was a focus on nepotism, not the general objective of hiring the most qualified individual without any definition. And there is nothing in the manual or anywhere else that says that recommendations from legislators and others, and judges and other people, are not relevant to determining who the most qualified individual is. Who makes the final determination as to who is the most qualified individual? Well, we believe that under the statutes passed by the Massachusetts legislature, beginning in 2001, with the general amending of chapter 276, section 83, to shift the appointing authority from the first justice and the chief justice for administration and management to the commissioner of probation, that Mr. O'Brien had the hiring authority. The final? The final. Could the chief justice reverse his decision? We believe no, based on the outside provision that was attached to each budget, beginning in 2001 and going through the time of Mr. O'Brien's tenure there, that said that notwithstanding any other provision of law, rule, or regulation, subject to appropriation, the commissioner of probation has the exclusive authority to appoint, dismiss, et cetera, probation officers. Now, to say that the chief judge has the authority to reject someone who has been appointed by Mr. O'Brien is inconsistent with saying that Doesn't that just depend on what the word appoint means? Well, there are a number of cases, we cited them in the reply brief, I think it's seven, that equate hiring and... But I thought the underlying statute, the pre-existing statute, that provides CJ with a role as to some approval of some hiring within the trial courts refers to approving appointments. It does. So doesn't that suggest that appointments here doesn't mean the final decision? No, saying that the exclusive authority provision... The exclusive authority to appoint, which the statute... Notwithstanding any other provision... But that all goes to what the word appoint means, and the statute for the trial court seems to treat approval of appointment, which suggests that CJ's role is not to appoint, it's to approve those who are appointed. But to say that Mr. O'Brien has the exclusive authority, and there's no inconsistency... He does. No trial judge can do the appointment, no other actor can do the appointment, he alone does the appointment, CJAM then approves it. Because there was no other authority... Under Section 83, it provided the CJAM with some authority to review, and the CJAM interpreted that as review only for compliance with administrative requirements, and he interpreted that as including merit appointments. But he did not say that he had the authority to override Mr. O'Brien's determination of who would be most qualified. Is there any case after the law was amended granting the administrator this exclusive authority? Is there any case in which the Chief Justice denied the hiring, or refused to approve it? Yes, there's Angelone, which was decided in 2010, after Mr. O'Brien had left. And that focused on the issues of nepotism, and that would indeed be... If the CJAM had authority to review, then that would be one of the things you're reviewing for, because the forms themselves ask questions about nepotism. The CJAM was not deceived by what Mr. O'Brien was doing. As I said before, this was a long-standing practice in the court, and in the reply brief we set out a number of examples of Chief Judge Mulligan's appointment of court officers, because he had the hiring authority for court officers, that took into account the political recommendations and influence of legislators in those appointments. So if what you're saying is correct, O'Brien could have just sent to Mulligan a letter that says, I appoint Joe Blow. I didn't follow any personnel standards at all in the manual. In fact, I just appointed him because Senator so-and-so asked me to do so, period. And that would be the end of it. Joe Blow would be appointed. That's your theory. Mr. O'Brien had been given by the legislature the final appointing authority. So if he didn't know, why didn't he? Instead he went through the process of sending these letters certifying that some standards were followed. Well, I think, first of all, this may... some of this may be just an artifact of prior practice, because Janet Mucci testified that it's her office that prepared these letters and sent them. And they were stamped, primarily, rather than signed. That... and Judge Mulligan testified that he was... that other people were signing forms that he should have been signing, just because that was the practice in... that had been... that had gone on before these legislative changes. So it may be an artifact that continues. It could be a... an effort to apply a veneer, because there are people who view political influence as something that is not the best standards. And, in fact, the legislature chose to change things afterwards. That would be applying the veneer by deception, by stating in a letter something that isn't true, if we read the standards as meeting the personnel standards. Well, but again, we suggest that you take a careful look at that section and the personnel standards. Right. Well, what personnel... I mean, you're narrow reading. What personnel standards are they? What's the reference mean? It seems rather nonsensical. It's... well, as the... it means the administrative provisions that... of this... of this section. So you're limiting it to 4.4? 4.4. And what are the standards other than 4.4? That you have to provide the documentation, letters of recommendation that show that these met the following criteria, which would be employment experience and delivery of human services, compliance with these standards, a copy of the application, a copy of the birth certificate degree, three letters of recommendation showing compensated full-time employment, employment experience and delivery of human services, and listing a number of specific criteria that one should meet. And, in fact, everyone who was hired did meet those criteria. So are you saying the standards are... some thing that we tease out of 108 and 4.4? I'm just trying to figure out what the reference is to personnel standards on your account. Well, actually there are two. There's A and B of 4.4. And it would be 4.4B because that relates to probation. And it lists six... So if you're listing employment documentation, so how is that a personnel standard? Well, you have... In first justice, this is what the SJC defined as personnel standards or described as personnel standards. The listing of these requirements, these administrative requirements, in 4.4. The applicant's interview and hiring rights. Well, the documents show that you, in fact, complied with these standards. Is it simply a paper trail that here are these documents? I'm certifying to you that I'm giving you all of these documents. You then go over to human resources because that's how people get paid and get their benefits and actually get on the hiring roster. And so you are certifying that you have sent over all of these forms and that these forms have the information that they are supposed to have in them. Thank you. Mr. Aymberg, good morning. Good morning, Your Honor. Martin Aymberg, on behalf of Appellant Tavaris, may I reserve 3.15 minutes for rebuttal? You may. I'd like to first address the jury question issue and then talk about the Rule 29 and how it affects Mr. Tavaris. The sheer number of jury questions, 280 questions, 180 or so were asked, is beyond what has occurred in any other reported criminal case ever. The government has not pointed to one that approximates 280 questions or 180 asked and certainly none have occurred in this district or in this circuit. In this circuit, we have warned the district courts about the perils of jury questions, that it's fraught with peril, that it has great risks in terms of undermining some of the principles of the criminal justice system. But in those cases, there were few questions, 7, 1, 11, and other. There were no objections. There were bland or innocuous questions. In this case, we come to the circumstance where the questions were substantive. They were continuous. They upset the dynamic of the criminal trial and they had all of the risks of turning a jury into an inquisitorial body. Were you a trial counsel? I was not a trial counsel, Your Honor, but I did review all of the questions which are before you in Volume 25 of the appendix and in reading the trial transcript, there was a continuity of disruption of the cross-examinations that were being conducted by the district judge in order to insert jury questions on separate subjects that were substantive questions. Were the objections made openly or were they made the mark? The principal objection, in contrast to Sutton and Cassell, was to the process itself. Mr. Fick, on behalf of Mr. O'Brien, objected to the process of jury questions. Mr. Fick, that's okay. The judge has the discretion to use that process. Your focus seems to be, therefore, necessarily not on the use of the process but the manner in which it would use, i.e., the volume of questions, the nature of questions. And what I'm finding difficult is finding in the record that latter point that you're making here today. So we have, as I see it, each juror basically got one question per day, if I do the math right, and nobody said, that's way too much or you should not let this question at this point. Most of them, as I read it, there's just no objection at all as the process plays out. It looks like defense counsel took an all or nothing, no questions or questions. The principal objection, Your Honor, is quite correct. It was made at the start of the process. Judge Young directed or invited the jury to open-endedly ask questions. The defense objected to that process. On occasion they wrote objection to the specific notes that were passed amongst counsel and to the examiner. But when Your Honor's focus on, and I think that the prejudice that was profound in this case, and it's on a number of different levels, if you believe that a criminal trial is both a search for truth and a process that guarantees a defendant, he will not be convicted absent the state, the government proving its case beyond a reasonable doubt, extinguishing the presumption of innocence. In this case you have another body, an inquisitorial jury, in essence whether designed or having the effect of helping the prosecutor fill the voids and the proof and assist them in essentially carrying their burden of proof in a very close case and a very difficult case. But that would be under a harmless error analysis, wouldn't it, because of the absence of that point being raised below. Well, I would contend that the objection to the procedure in this case, where again the judge didn't narrow it to qualifying questions, he gave few instructions, cautioning the jury as to the limits of their role, where he invited them to be a participant in the process, but the proper objection was to the process. And the way the process played out day after day through this lengthy trial far surpassed the kind of questions, both in number and in content, that this court has previously approved. And it had all of the dangers that are inherent in that process that were identified by Sutton and Kassir. They assisted the prosecutor in carrying its burden of proof. They disrupted the delicate dynamic of a criminal trial where the responsibilities are largely on the advocates to plan and conduct examinations. Cross-examination is very difficult. I've done it for 44 years. You plan across. You don't know the answers. And here the cross-examiners were frequently diverted from their plan through questions that the judge inserted that came from jurors. But the most profound prejudice, and maybe it's unprovable, but it's the one that this court has identified, the Second Circuit in the cases we've cited, the Bush case, and I think it's called Amjo, have talked about is the transformation of a jury from its role at trial of fact, the historic and constitutional obligation, into a more active and inquisitorial body that, in turn, carries risks of premature deliberations, of jurors reaching opinions, of them communicating with each other, and of just the abandonment of that historic role that we confer on them to essentially be triers of fact, to watch the trial. I think that the challenge to the process was effectively on the table, and everyone knew at that moment, if the judge goes forward, what this means is jurors are going to be asking questions every day, and that could, if you just start thinking about it, given how many days this is going to go on, could be far more questions in total than had ever been asked in a practice. Assuming that's developed up, that what are we supposed to do with the other aspect of the math analysis, which is, in a three-day case in which there are nine questions, there are only nine questions, but there are three a day. In a 50-day case in which there are 150 questions, there are also three questions a day. How are we supposed to think about why 150 questions is worse than nine questions if they're asked three a day in both cases? Because I think day after day, the risks that have been identified by this in the Second Circuit compound. The risk of premature conclusions, the risk of jurors taking sides and preferring the party that answers their questions. And here, when you look at Volume 25, that issue put on the table for the district court, in other words, whether they created the district court in the objection, that even though it's fine to have some questions in a short trial, you can't have the same line of questions in a long, complicated trial. Well, there were some objections to some questions. The record is not ideal, but I don't know that the court needs to resolve it between a preserved abuse of discretion or a plain error, because when you look at Volume 25, both the questions asked and the questions not asked, you see a jury that's inquisitorial, that's taking sides, that's filling voids, that's not just seeking to qualify, but seeking to really substantively ask questions that are designed to elicit proof, and in this case, incriminating proof, because they were asked of government witnesses and they were designed or had the effect of filling the voids and the prosecution proof in manners very harmful to the defendant, to Boris and the other co-defendants. You wanted to make another point other than the juror. Yes, thank you. I wanted to switch, and it's, even if the court rejects the arguments that have been presented about mail fraud and RICO being beyond the outer boundaries of the congressional intent that is being presented by my co-counsel, and even if Your Honor finds that the certification satisfies the materiality element, the proof as to Ms. Tavares needs to be that she knew of the certifications, knew of their falsity, and shared the intent of the author of the certifications, boiling down to its kind of minimal element, the core of the mail fraud. In this case, the evidence was lacking under the standards set largely in the United States before the case, by Your Honor, when you determined that in order for an 8-year-old to better be guilty of a 922, they needed to know the felony conviction of the possessor of the gun. Here, Ms. Tavares, there was no proof, participated in the certifications, saw the certifications, delivered them, was consulted about them. She was not a participant in the third round of interviews that led to a selection that thereafter was certified. There's no evidence in discussions between her and Mr. O'Brien as to who he was certifying, as to why he was certifying, as to what was the basis of the certification. Was it his belief this was the best quality candidate on tests, on interviews, whether there was an effect of recommendations, whether it came from a legislator or a judge? There's simply a void of proof on a count-by-count, certification-by-certification requirement, which alone is sufficient to satisfy either the substantive mail fraud or the legal predicates for which Ms. Tavares was convicted. And because of the act, there was no evidence that she was ever told that Mr. O'Brien didn't fully believe the truth of the certification. There's no showing of intent. Is there any evidence that she ever saw one of the certification letters or knew what he was required to certify, arguably, under the manual? The most there is, and the government says we can assume, that Ms. Tavares' second deputy commissioner, a lawyer, who two years later said to the Boston Globe that Judge Mulligan was required to approve the process, it's an assumption that even if, under Rule 29 standards, you can infer some level of knowledge of the manual and its various requirements, there's no evidence that on any specific mail fraud predicate she knew who or why the commissioner was certifying a certain candidate, knew his reasoning, knew whether or not he believed in good faith that he was making an accurate certification, or shared in the intent. And I don't want to suggest that on any certification there was anything other than fidelity of the law as to Commissioner O'Brien. It defined neither of the better or co-conspirator responsible requires a different level of proof. Tell me what's wrong with this chain of reasoning, which I take to be the government's justification for it. Isn't there a reason to conclude that candidates who were approved listed in the particular accounts were hired even though they were not the people who were hired in their merit system? Follow up question, right? Yes. Okay, so assuming that Judge O'Brien didn't conclude that, and she is reasonable to assume that she knew they had a new certification because she went in to know what they had done. Right? Yes. And, legally, what is, I know you guys disagree with this, but legally, that the certification means that this is a merit matter. Then why couldn't the jury conclude that she must have known there were going to be false certifications? There could be a mark about that, but why isn't that a jury question? Well, one, there's no basis to show on any specific certification. That's the weakest point. The second weakest point is that she didn't show intent to further any deceit upon Judge Mulligan. There's an absence of knowledge as to the specifics of any particular certification, and there's an absence of proof that she, doing her job as second deputy, she showed any illegal intent that would transform political conduct into a mass threat. Well, what if, why couldn't a jury conclude on that record, assuming that there was a base for a jury to conclude that she knew the appointments were not meritorious, but not based on a merit system, why wouldn't the intent be to make sure that they were hired, notwithstanding that they weren't hired through a merit process, why couldn't a jury conclude from her actions that it must have been her intention? There could be a mark about that, but why isn't that a jury question? Well, then I would corner her with the proposition that she knew that this was not merit-based selection, or that any specific selection was not merit-based. She had no basis to know why any specific certified is advocated. That's the case. By the key, you mean that even if you accepted the government's argument that she knew that something was amiss here overall with the system, if we take each one of these specific charges, I think you're saying there's no evidence that she knew that that person was being recommended didn't happen to be the best qualified under the standards. Yes, there's no 1349 charge. This is substantive male fraud, both in terms of RICO predicates and the male fraud statute, and there is simply no basis. There was no conversations. There's no evidence that she focused on certifications, focused on the manual, had any discussions which would allow her to have a basis of knowing why, as to any particular candidate that was selected. Could you readjust the rejection letters and what is or is not problematic with those? Yes. First, the instruction did not zero the jury in on what was required, which is an actual mailing and that that mailing be in furtherance of male fraud. They spoke purely in terms of foreseeability, reasonable understanding, what an aider and a betterer, a co-conspirator might have to know, but never gave the jury diminished, this essential element of federal jurisdiction by not requiring, whether it was supplemental instruction or any other number of instructions given by the judge, that you need to find a mailing and you need to find it in furtherance. The government argues interstate commerce instruction was a substitute, but it's not a substitute for the clear express instruction requiring the jury unanimously to find a mailing in furtherance. We further argue that these mailings were after the decision was made as to who the selecting would be, and they were ordinarily recorded. They didn't have the effect of furthering the male fraud. They were letters that are sent by any employment entity to everyone except the person who was selected, and therefore they're very similar to the cross case in the Third Circuit, which is an almost parallel precedent where you have a rigged judicial findings and then you have the results being mailed to the litigants or to the unsuccessful litigants, and it's simply attenuated from continuing the scheme to defraud to constitute the essential element. In terms of the case where we're interpreting SHMO, we say that if perpetuation is essential to the scheme, and here perpetuation would be essential to the scheme if there's a scheme, right? Yes. And the question is just is mailing incidental to the perpetuation? Yes. Right. So why isn't mailing incidental to the perpetuation in the sense that the hiring process, according to the manual, requires notification of the rejected applicant? So if you imagine someone's going to do a scheme, then to have a sham hiring process is to have a process they know culminates in a rejection letter. So why isn't that enough to say under Pachacamino that even if legal requirement, because we've made clear that legal requirement is not dispositive of whether it can be for the purpose of, why isn't that enough to say they knew mailings would be involved in so far as they had a scheme to defraud? Yes. I don't call this mailings were foreseeable having rejection letters sent to the candidates that didn't get the job are foreseeable. What I contend is that it furthered the scheme because those people who didn't get the job, what would they have done if they didn't get a letter? They would have called the probation department. It might not have disrupted the perpetuation of it in the sense that somebody calls and says they never got a letter. Does that plausibly cue people to turn out to be, why aren't you sending the letters, the manual requires the letters to be sent? I think it will possibly result in someone in the probation department saying, we're very sorry, we should have sent you a letter informing you, but thank you for applying and you did a great job, apply again. There's nothing in the record to help us figure out which of those two instances would be more plausible. No, Your Honor. Thank you very much. Thank you. Mr. Regev? If it pleases the court, my name is John Amabile. I represent William Burke. Oh, I'm sorry. I would ask to reserve one minute of the ten minutes that we've agreed I will present argument. I'd like to touch on three issues briefly. One of them is that under bail fraud, there was no evidence of any deprivation of tangible property. The second issue is that there was an erroneous exclusion of evidence of changes in the hiring process after the period that led to this indictment, namely in 2011. There was an amendment to Chapter 276-83 which changed the process. And thirdly, that my client was convicted on one count of racketeering conspiracy with woefully inadequate evidence. Now, with respect to the issue of tangible property, Your Honors, we have to first of all understand that what we have in this case is the appointments of only very qualified applicants. The government has conceded in its brief that before any interview process where there may or may not have been information communicated to interview panels, that there were two layers of screening of all of the applicants, a paper screening and a preliminary interview, and that at the point when candidates were interviewed by the only panel required under any of these manuals, namely the judges' round panel, all of these applicants had been screened and deemed to be very qualified applicants. So in this case, every single person who was appointed or promoted was a qualified applicant. Therefore, the notion that there was a deprivation of property, and again, this has been a moving target throughout this litigation, but the government is relying on the idea that the Commonwealth was deprived of money and property through the payment of salary and benefits to the appointed employee. These appointed employees were bona fide candidates who were properly appointed and who, in fact, had a... Well, in this case, when they were appointed, you just assumed the whole case, haven't you? Well, no, I don't. The government's case is that the government's money was to go to the person who was properly appointed, and through a scheme of fraud, the defendants often made sure that it didn't go to that person. That may be their position, but the facts do not bear that out, Your Honor. In some of those occasions, they went to great efforts to make sure that the person who under the full manual standards appeared to be very qualified didn't get it, and someone who had very little government employment or were marginally qualified did get it because the legislature asked for it. Your Honor, I would suggest that that is not a correct reading of this evidence if it's scrutinized carefully. There's not a single instance where the government points out an alternative quote-unquote most qualified candidate. That doesn't exist in this case. So, like in death, what would they do to people who were appointed? Well, first of all, again, the process entailed screening the applicants down to a pool of eight people. It did not necessitate or require any kind of ranking, and from that pool of eight people, the commissioner had the authority under the manual to select any of the eight people. I think you're just going to now take us back to the argument that this was not a merit-based hiring system. No, I don't agree with that. If it is a merit-based hiring system, your proposition is that under a merit-based hiring system, every person who was hired would be hired again? Yes, Your Honor, I would suggest that that is correct. So the change in the law in effect would just be to confirm that all hired would be hired again? No, the change in the law had to do with the issue of consideration of references at this judge's round hiring. Do you think it had no impact on who was hired? Your Honor, I'm saying that the notion of who the best person is is a completely subjective position, and that the idea that references may have been factored in or other outside factors, that was the process of longstanding. So yes, there was recommendations, yes, in circumstances that were conveyed to members of the hiring panel, but to then make the leap that the most qualified candidate wasn't appointed is not provable or not concludable on the evidence in this case. So you're saying the fact that you have a patron makes you the most qualified? I'm saying the fact that you have strong recommendations might very well make you the most qualified. Does it help that the strong recommendation is from a legislator? Does that make you more qualified than somebody who has a strong recommendation from, say, their supervisor in the probation department in another state? I think that those things could be viewed equally, Your Honor. Under a merit system? Yes, and I think that there is no evidence but that this was, in fact, or that we could not conclude in the evidence in this case that it was not a merit system. Now, looking again, I'm going to move on to the issue of the change in the law. The evidence in this case from the government was there was substantial evidence that the judges around hiring panel, which included a commissioner's designee, was providing information about references and that that was somehow an improper thing to do. Now, the fact of the matter is that the manual allowed the commissioner or his designee to sit on that judges around panel. By pure logic and common sense, there was nothing at all inappropriate about the commissioner communicating his preferences to his designee on the panel. Now, this problem was exacerbated by the charge that the judge gave at the end where he called that process questionable and addressed that issue in the briefs. But then, let's take it a step further. At a point, we attempted to introduce evidence that after the 2010 era ended, there was a change in the legislation which prohibited conveying resident recommendations to the judges around panel, and that was excluded on the erroneous notion that it constituted subsequent repair under Federal Rule of Evidence 407. Well, of course, that rule has no applicability whatsoever in criminal cases. That rule was designed as a policy to prevent evidence that might discourage a tort offender from correcting defects. In fact, that evidence was highly relevant, and its exclusion, especially in conjunction with the fact that the judge charged that it was inappropriate to do that during that period of time, created profound error with respect to the trial of this case. Now, moving to the final issue, Bill Burke, in terms of proving that he was involved in a racketeering conspiracy, the evidence was essentially non-existent. He could not be said to have foreseen the commission of any racketeering acts because he was acquitted of all 10 counts of mail fraud that he was charged with, and this was both under the theory that he participated directly, which was rejected by the end of the trial, but also under the so-called Pinkerton theory of vicarious liability, where he could be deemed to have foreseen the commission of these racketeering acts. The jury acquitted him of those that weren't directed. He was acquitted on all 10 of the counts. Now, in this case, the only evidence that the government points to in terms of one, they don't even attempt to outline two supposed predicate racketeering acts. They point to one, and that is of the hiring of an individual or the promotion of Frank Grunowitz, and as I indicated in the brief and the reply brief, that's actually a poster book example of how ad hoc and how completely impossible it would be on this record to determine that the most qualified candidate in that particular hiring round was not, in fact, the point, where all three of the judges around the panelists picked a different individual, two of them having served as the references to the person that they ranked as the candidate they wanted. So this is an ad hoc process. The Grunowitz hire does not provide any type of a so-called predicate that he agreed that racketeering acts should be committed. My time is up, and I will rest on that, but I would ask that the court reverse my client Bill Burke's conviction and order a judgment and acquittal. Thank you. Mr. Osterreiter. May it please the court. I'm Stephen Osterreiter on behalf of the United States, and if I might, I would like to try to sort of respond seriatim to each of the defendants' arguments. The first argument we heard from Mr. O'Brien was that the certifications were as to this narrow personnel standard that's mentioned in Section 4.4 of the manual. Our response to that is Chapter 211B, Section 8, which this is the section of the legislation that gives the CGM the authority to promulgate personnel standards. Those are the words used in that section. Judge Morgan testified at trial that personnel standards referred to the manual. So we think necessarily Section 8 requires certification. So it's not the manual that's requiring certification only. It's also this. So we think taking the ending section 8 is in the manual, excuse me, in evidence before the jury. The manual is in evidence before the jury. So they can conclude, and they can also conclude from the certification or the assertion that came along with the certifications, that assertion was that Mr. O'Brien was selecting people because they were the best candidates. So that's the additional evidence that the jury can rely on to say. What evidence is there that he didn't select the best candidates? The evidence is, well, if I can just back up one second. The gravamen of the prosecution is not just that he's not selecting the most qualified candidates, it's that he's not trying to. He's selecting them based on political patronage. So the evidence of that. What is the evidence that that's the only criteria he used? Well, the evidence of that is, for example, Ed Ryan testified that Mr. O'Brien preselected candidates before the interviews. So Ryan was using a sponsor list in coming to Mr. O'Brien. Is that evidence of general nature or is that specific candidate that you're referring to? I think it's of a general nature. So it pertains to the conspiracy as a whole. There's also, Mr. O'Brien testified, but just for the money, for the property point, the separation of property, doesn't it have to be the case that the appointees who were approved were not the most qualified ones? It's not enough for you to have a property deprivation claim here to say that even though the ones who were picked might have been the most qualified, the process used was not good enough. Because that would deprive the government of the process it wanted, but it wouldn't necessarily deprive them of any money going to the most qualified person. Well, if that's a requirement, there is evidence as to particular appointments. For example, Mr. LeBlanc, there's testimony from the chief probation officer who was on the second round panel. That chief probation officer, I think it was Michael LaFrance, went to Mr. Bosman and said Martin was not an appropriate candidate. There was much the same evidence. Is that final? I mean, is Mr. LeBlanc or Lori Oles involved? Is that up to their own opinion? They weren't up to their own opinion, but again, the judgment was not. Martin was chosen for a sponsorship reason, and that sponsorship came from Senator Therese Murray, who was the Senate president. Much the same evidence can be said as to Kelly Manchester, for example. Ed McDermott participated in the third round panel. The third round panel was totally a sham. I don't think there's ever much dispute about that in this case, but Mr. Wall's testimony is the point of the third round was not to select people who were qualified, and Ed McDermott testified at the same point. Let me just make sure I'm understanding the government's argument. There's two possibilities. One is the persons hired were hired through a sham process, therefore we can't say they're the most qualified, right? Second possibility is they were hired through a sham process, and they were not the most qualified. Which is the government's position? I think it's a matter of two or three. I don't know if we have evidence as to every specific candidate that that person who was, as in those who don't, has got to be the former candidate. That's right. How can that be a valid theory, given what problems there may be? Well, I think the Soarich case stands for the same proposition that, you know, the state is entitled to decide how to spend its money. So we do think that either one of those options is a valid property theory or a money theory under Doherty and Soarich, both. In either of those cases, I don't think it was, the court didn't suggest that it was an element of the offense that, you know, and the people in Soarich were not having qualified, but they were appointed through a patronage scheme as well. And that just wasn't, so the crux of that case, too, was that assertions were made that they were the most, or excuse me, that they were qualified candidates and their appointments were based on merit. So I think this is on all fours with both of those cases. Are you familiar with the term log rolling? I am. And what do you understand log rolling to be? I guess it would just mean legislative trades for other, you know, it's, you know, horse trading, I'll vote for your thing if you vote for mine. And is that illegal? No, it's not. Well, why is that, why, this is what Judge Estherbook had to say about it. Governance would hardly be possible without these accommodations, which allow each public official to achieve more of his principal objective while surrendering something about which he cares less, but that the other public official cares more strongly about. Why isn't that what we have here? I think you're, I think Your Honor is referring to the Blagojevich case, and the difference is that if this had been done, if all parties had equal knowledge of what they were getting into, that's one thing, that may be horse trading. But Judge Mulligan thought that he was, he was seeing certifications about, you know, assertions that Mr. O'Brien was making appointments based on merit, and those were false assertions. If Judge Mulligan had known all that, and if Mr. O'Brien had been a friend about that, I'm pointing to these people for, you know, political reasons, that may, we wouldn't be here. We certainly wouldn't be in a mail flight prosecution. Why wouldn't you be? Because I thought the government's theory was that the property had taken from the people of Massachusetts. But I think there's some people in Massachusetts that have a manual, which in the government's account requires a certification that says the merit base is higher. Who cares what Judge Mulligan considers? I thought that was the government's theory. Is that not the case? That you can only then know what Judge Mulligan's view of this was? I think I was just, I think I was just responding to Judge Torreira's point about, I was just making the point that if there's equal knowledge, then it's not, or if there isn't equal knowledge, then it's not law-enrolling, I guess, is what I was trying to say. You said it wouldn't be a mail flight. Well, if you're always referring to materiality, the standard for materiality is whether it could influence Judge Mulligan. That's the standard in the Nader and Prieto. And the district court in this case required more than that. We didn't think we needed to do that. We didn't need to prove the lies, but we also had evidence of the lies. The jury could credit Judge Mulligan's testimony to that effect. Can you find it material if Judge Mulligan knew that he wasn't getting merit-based recommendations from O'Brien? Yes, you could under a proper instruction with a Nader or a Prieto instruction, if it was at all capable of influencing. How could it influence if he knew what O'Brien was doing? Well, if he knew, he would have to know every aspect of the scheme, I think, though, because the certifications, I mean, there's a prime minister's appointment. But if he just knew that things clearly weren't merit-based based on the manual personnel standards, if he knew that, could you have Nader or Prieto? I think he would have to know all the material aspects of the scheme, and I don't think he did. I mean, so when the defendants say that Judge Mulligan knew what was going on because it was going on for years, I mean, he didn't know about the third. But the allegation wasn't that they told him. The allegation isn't that they didn't tell him about the scheme. The allegation is that they certified they were using the personnel standards. So that's the only statement that I think you point to that's wrong. Well, I think... And if he knew they weren't using the personnel standards, could you have materiality? Perhaps you couldn't, but I think it's not necessary to answer that question in this case because he didn't know. Certainly, you know, I think the defendants point to this April 2006 conversation that Judge Mulligan has with Mr. Dalton. What Judge Mulligan doesn't learn from that conversation, though, is, you know, all the specifics of which appointments might be involved, you know, what's going on exactly with people being... But he doesn't need to know that. All he needs to know is they're not doing... In other words, all he needs to know is that the certification is false. They're not using the personnel standards the way they're supposed to be used. However, they may be doing it. He knows that the... If he knows that the statement being made to him is false, then how do you have materiality? Well, I don't... That's the only statement, and I don't think you do, but... That's the only statement, isn't there? Other than that statement in the certification letter. Well, there are... Again, I mean... Is there any other statement? The statement in the cert... Well, the statement in the letter is not just... I'm... It's... I'm complying with the trial court's personnel standards. Right. So the personnel standards require a merit-based system. So it's not just... It's... It's true. Judge Mulligan thinks an appointment process pursuant to merit is occurring, and it's not occurring. So that, in our view, is what was wrong. We're trying to ask you whether that's necessary. We disagree with you on that. We thought Judge Mulligan knew that it was not a merit-based process. How could the certification be material? You seem to say that it can't be material. I thought the government's view was that we don't care about Judge Mulligan's state of mind, because it is a false statement in connection with a certification that's necessary legally to an approval of an appointment. That's right. I think that's right. I mean, again, even though... I mean, what about the economy's position? You're trying to have people approve an appointment. The position is undermined, or the standard is... Could it influence... Does it have a tendency to influence? Is it possible to influence the decision-maker? The decision-maker in this case happened to be Judge Mulligan, but it couldn't have been any CJAM. It wasn't subjective understanding. It was whether objectively... Could Judge Mulligan have approved an appointment with Parliament's certification? I don't believe so. I don't believe there's such a need for an appointment without necessarily making material. I think that's correct. Judge Mulligan's statement is false, but it's a false un-material statement. That's correct, yes. There's something that is not clear in my mind. I wish you would help me with it, and that is, why is the federal government enforcing what is basically Massachusetts' first federal law? There's a suggestion in this case... I would just step back for a second and point to the fact that this is a 10-year conspiracy. That doesn't make any difference to my question. Well, the difference that it makes is that at some point the federal government can come in and say, this is a corrupt use of the United States' mails, and we don't have to stand up for it. And apparently this case on the letters? Rejected. That's correct, yes. Accepted two appointments. There was an application for somebody who was seeking a promotion that Mr. Glennon was received, and then Mr. McClain's appointment letter from Judge Mulligan. Well, all the letters say he didn't get the job. How is that for you? Well, for one thing, the letters, and I think you'll see this at 7429, the Joint Appendix, the rejection letters are misleading. The rejection letters specifically say that the third-round interviewers were impressed with your credentials, and this was a very difficult process for Mr. O'Brien to undertake, but he's made his final decision. If those had told the truth, what they would say is, you were selected because you had the wrong sponsor, or you didn't have any sponsor, then there would be no mail fraud. Well, there would be no federal hook. I mean, I don't think your whole case hinges on the fact that the letters had those embellishments. I don't think it hinges on whether they were embellished. They don't need to themselves be misleading. I'm putting aside that they are misleading, but they don't need to be misleading. They only need to be incident to an essential part of the scheme under the Schmuck case. And, again, Sorech is also on a point with this. A rejection letter that lends credibility or gives it, you know, gives it a credibility. The Schmuck case involved mortgages, did it? Sorry? The Schmuck case involved mortgages. No, the Schmuck case was the car dealer case, where it was a tie-in of applications from a third party, from the retail dealer to the state, I think. And those were incident to an essential part of the scheme, because there was a need for harmonious relations between, you know, sort of the wholesale defendant and the retail dealers. How would an unadorned rejection letter facilitate harmonious relations with the rejected applicant? Well, so there was a need for harmonious relations with the rejected candidate. I mean, so how would it improve things to give them a rejection letter as opposed to not giving them a rejection letter? Well, that's the raising of eyebrows over time. So, I mean, if in year zero or one no rejection letters are sent and people are wondering, well, what's going on? These are required by the manual. I don't see that these were sent to me. What's going on? But, you know, certainly by year four or five, at some point, the scheme doesn't perpetuate anymore. Someone might have raised questions. Now, again, that's a jury question. It's whether the jury could think that this was incident to an essential part of the scheme. The jury, well, you know, that's an understatement. That raises an issue. When you just say incident to the scheme, that's not the test. Isn't the test that it has to be in furtherance? I think that's, well, the language of schmuck is a step in the plot or incident to an essential part of the scheme. I'm quoting from the case law rather than the statute. The statute uses, I think, in execution of. But this is how the Supreme Court has interpreted that statutory language. And Contra Bonita, as you all referred to earlier, the Serino case, both of those cases apply a very liberal standard of what is in furtherance of or in execution of a fraud scheme. And, again, we have a case right on point about this. As I understand it, after the jury went out, they sent back a question. And it was about something to do with materiality rather than these letters. And the trial judge told them that it was enough that it was reasonably understood that they would be used in the course of the alleged mail fraud. Is that the correct standard, that it should be used in the course of? I think, taken together with its other instructions about. But I'm just saying, it seems to me, this isn't the whole thing he's saying. The reason it's understood that they would be used in the course of the alleged mail fraud is I have defined it for you. Right. And then counsel says, I think Your Honor should say that the mailing has to be in furtherance of the scheme, not merely incidental, which seems to me to be correct. And the judge then says, I'll correct it. And then he doesn't. I think, standing alone, that might be a problematic instruction. But the court had already defined the mailing element in terms of, if the defense reasonably understood that the mails would be used to execute, then the mailing element was correct. That's tricky, because the judge gives all these instructions. We all know the jury can't absorb all of them at once. And he wasn't consistent. He sometimes said, going to be used. The other side said, in the course. But then when they come back and they're given a specific injunction, instruction about this one issue, and he gets it wrong, how do we, unless we find it's harmless, how do we let a verdict stand based on that? Because that's presumably the only thing they would have in their mind when they then vote. Well, I think the instruction, the district court gave them an instruction to consider all of the instructions as a whole. And the district court did give the jury on the first day of deliberations, and I think you'll see it on page 71 of the joint appendix, it gave it a copy of the instructions as a whole. So they would read through those, presumably, if they had any confusion about, if there were inconsistencies. As to your comment on this point, I think that is our stronger point about the mailing element. This is not a disputed, at trial, the defense made their institutional points as a matter of law to the district court. They did not make them as a matter of fact to the jury. And there's also, because of the, they don't really explain, I mean, I think you see one line of explanation in Ms. Tavares' reply brief about how this could affect the conspiracy count if there was an error on the mailing instruction. We don't think that that's, it can touch the conspiracy count, because what they, the defendants say is, you have to have, to conspire, you have to have a reasonable understanding that the mails would be, or we have to agree that the mails would be used. If we're going to commit racketeering with mail... Sorry. Used in execution. Used in execution, correct. And the district court gave that, the district court required, specifically, that the defendants had to reasonably understand that the mails would be used to carry out a scheme. An execution of the scheme, in other words. So, at a minimum, there was at least a requirement of agreement to that. Because, going back to the schmuck, I think the Supreme Court said that they have to be insolent to an essential part of the scheme. And they go on to say that the mails in that case were essential because they were part of the passage of time to the cars, which in turn were essential to the perpetuation of the scheme of the flood. How could these letters move within that rubric? I think they're essential to the scheme because, again, if they're not sent, questions are raised. But, I mean, at some point someone will raise questions and, you know, the scheme will be discovered. And that's what was discovered, but that doesn't mean they were essential to it. They don't need to be essential to it. I don't think somebody's going to it. Well, I'm not sure if it says that in so many words. I think it says 1447 to 1450 of schmuck. I believe that this Court interpreting those cases has said that it doesn't need to be essential. I think it needs to be. Even if the scheme could continue without the mailings, they could still be incident to an essential part of the scheme or a step in the flood. I think a case I'd point to on this is the Hebshie case and the sufficiency portion of the Hebshie case. There the Court addresses, and this is the case where the defendant committed arson and set fire to his own business, and then he sends a claim to his insurer, and the insurer sends a reservation of rights letter back. And this Court held that that reservation of rights letter could be incident to an essential part of the scheme or could satisfy the requirement, even though it doesn't necessarily refer to the scheme in any way. It's not something from the defendant that's misleading the insurer, but it's part of the shuffling of paper that goes back and forth, and that's just part of the expected mailings of the scheme. The thing there is that the person who's being defrauded on the government, with the insurer here, the person being defrauded is the government, and yet the letter's going to the rejected applicant when the government's theory is not being defrauded. I think that's true. So then that just already makes it maybe a little less directly related. And so the concern is, why is that enough? Because that's one way the government can find out. I think it does perpetuate the scheme, and I think that, again, is the standard under the Caccia Bonilla case is perpetuation. Where do you draw the line? I mean, for example, calling the guy who won, having him or her show up and give them the first check, those are all things that follow from the scheme. They're incident to it. In fact, they were the aim eventually of it. But are those steps that are done by mail the impertinence of the scheme? They mail the first check, the paycheck to the guy? I believe so. I mean, there's no end. What you're basically saying is if any part of this process at all involved, for any personal reason, no matter how otherwise benign the use of the mail is, we've turned this state offense into a federal mail fraud RICO case. Caccia Bonilla and Serino come pretty close to saying that if the mails are used in execution of the scheme, incident in this way, and Heschey again, too, is a letter that doesn't even further the scheme in the sense of defrauding somebody, can execute the scheme. I'm sorry. So the government's view, any non-merit hire is a non-merit violation? So long as you notify the people that weren't hired? Well, you have to be making an assertion, and a material assertion. Any non-merit hiring, any non-merit hiring scheme? In this case, if the probation office was sued under Title VII, was found to have committed a Title VII violation, that could be prosecuted as mail fraud. If a certification is made, certainly it needs to be made because it has to be for the approval. Right. And then there's evidence that actually rather than being mail-based, it was racial discrimination. That could end up being prosecuted, not just under Title VII, and civilized by the government to come in and bring it up and go. If the state is deprived of salaries, yes, I believe so. And making another assertion, too, that even another personal profit required in that case. So we don't even need a certification under your theory. If they just went through the process and mailed a letter to someone and said, sorry, you didn't get it, you were great, but it was a close call. And in fact, it wasn't. There's your mailing and there's your fraud. But I don't think there's a decision-maker there. I don't think the rejected candidate is the decision-maker. Yeah, under your theory, the rejected candidate therefore decided not to go in and inquire as to what went on and why things were done. I'm not necessarily sure that's what the case law means by decision-maker. I mean, even though this court does not require conversions as an element of mail fraud, the case, I think the Christopher case makes clear what it is. Still, the decision-maker should be the person who's making the decision on behalf of the case. Let's assume they're doing the exact process now required under Massachusetts law for selecting a probation officer, and he gets to the last thing. And someone on that committee says, I think Joe is the best, and I give 20 points. Could the government bring a criminal case against that person saying, you really didn't think that, that was false, and that's why the person got hired? I'm just not sure. I don't know the answer to that. What is your theory? What is your theory if you just couldn't bring that case? It would be a false certification. It would be a misleading statement. It is a merit-based hiring system. There will be a rejection letter sent. So what's the problem? Those are the elements of mail fraud, I guess, is my response. I mean, that case would test the limits, but I think those are the elements of mail fraud. If the government can prove those up, I doubt it would bring that case in the first place, but if it could prove those up, that's elemental mail fraud. If I might just, before you leave it, just on the rejection letter, since it's a specific intent crime, what kind of intent does a defendant have to have with respect to the purpose of problem of mail fraud? So I understand your theory that, in principle, the letter could be perpetuated, because if it was more than 45 days, if no letters were sent, maybe it would all break down. That's a possible instance of drug. That was why the letters were sent. That was their intention. But it seems like a really plausible computing difference would be the letters were sent just because the letters were always sent. The mail was always sent. They didn't do that in the least bit. They didn't do that to the perpetuation. They did it against the end of the policy. Well, I don't think in this case that when the letters are being sent out at a different time and they're otherwise supposed to go out under the manual, I think... Is there any evidence as to why that happened? I don't think there's any evidence as to why, because that's enough of a jury debate since they must have been sending it in order to perpetuate rather than just to compile the manual. I think that, well, I mean, if you combine that together with the fact that the rejection letters are misleading, combined with the fact that... Is there any evidence as to why you're mistaking the letters with other rejection letters that are ordinarily sent? I don't think there is, but I do think that the rejection letters do not compare favorably with the defendant's knowledge in this case. The defendant's knowledge was that there was a third-round interview process that was a sham, that was not in any way based on merit, that the candidates for which were preselected, that the whole reason Mr. O'Brien took... Beyond that one, what is the evidence that their intent with respect to the letter was to perpetuate this case? Is there any evidence to support that? I don't know that their intent... Beyond the fact that it was sent? Beyond the fact that they were sent and they were misleading in a way that was not... Do they have to be evidence of their intent to perpetuate? I don't believe so. There has to be an intent to defraud. Why does it have to be an intent to defraud for the purpose of trying to defraud? I think that's a specific intent to defraud. Well, isn't your answer that the jury was instructed that they needed to find that each of the people understood that the mails were going to be used by someone? Absolutely, yes. I think I was trying to answer whether there would be sufficient evidence of that, and I think the sufficient evidence of that is that they know about what the truth is, and they know how the rejection letters are misleading. If I might turn then to Mr. Barrack's claims, and starting with the juror questions in this case. We don't dispute that the number of juror questions in this case is higher than any other case that the defendants have cited, or that any of the parties have cited. The reason is because the trial in this case was longer. The number of questions submitted per day was eight. The number of juror questions asked per day by the court was five. That's not at all out of line with other precedents. The DiBenedetto case, in that case, I think it was something like six questions were asked per day. In the George case, in the Eighth Circuit, the number of questions submitted per day was nine. The defendants in the repriority of Mr. Barrack's reply group, they cite the Seventh Circuit jury study that we've also cited, the Canyon case that cites that study. That study reflects that in what I think was 31 trials, you can see that on page 19 of the Internet link that the defendants provide. There were 31 trials in that study in which jurors asked questions. I think the average amount of questions submitted by jurors in those cases was something like six per day. So, again, and Judge Barron has this question, and this is how we think that this is a proper way of viewing sort of the number. It has to be viewed in context because the standard is totality of the circumstances. Put that into the context also. Add the 180-some questions. It's more of a brief, actually, in terms of length. Add to that the instructions using the questionable language. What do you think that does to the defendants' case? Well, I think that a couple of things. One is that the defendants haven't really, I heard the defendants say they were prejudiced. They were prejudiced, if at all, why? Because they don't actually object to the questions themselves in terms of whether they elicited inadmissible evidence. I think there was only four or five objections on this point. And as Your Honor was alluding to earlier, there was an objection at the beginning of the process. But if the defense was concerned that the jurors were taking over the case and becoming sort of mini-prosecutors, one would expect an objection going forward and saying, look, Your Honor, at the beginning you said that this was the process, and we understand that, and we understand that under Sutton you have discretion to do that. But this is now approaching a Sixth Amendment violation because of the tenor of these questions. That just didn't occur. As to the specific questions to which they objected, we don't think they're so one-sided as the defense would indicate. I mean, this is, clarification is in the eye of the beholder. Most of these were matters already raised by the parties, and the jury was getting at different angles that they were interested in. One of the questions, I think, was the jurors asked Mr. Wall, did you have guidelines for making sure the non-preferred candidates weren't, you know, weren't ended up being passed on, weren't ended up being ranked number one. And this was, we've cited, and this is in footnote 49 of our brief, we cite the questions to which the defendants did object, and I think this is one of those. That's just, that's something, again, it wasn't the jury eliciting that there was, in fact, a third round, that it was bogus. It wasn't the big, there was no bogus language in a question like that. It was, okay, so you've told us about this, now tell us some more specifics about it. We think that's clarification. That was a typical type of a question, even forgetting that there were a number of sort of non-substantive questions in this case, or just procedural questions about, you know, when the moving packets went out, that sort of thing. Those were the types of procedural questions. So at the time, you did pass a candidate on when you felt they were not the best food? Isn't that the very issue of this case? I think that's asking the issue of a particular witness, and I don't think that's, again, I don't think you have inadmissible evidence. But we're talking about coming from a juror. We're not talking from a lawyer. Right. Well, and so, again, the defendants don't argue that this is structural error either, that that couldn't be harmless. Again, the crux of their claim is that it was prejudiced because it elicited truth. The function of a trial is to elicit truth. And if this is relevant evidence that bore on guilt or on innocence, then that goes to whether there was a fair trial or not. If I might turn then to the, to my question a little. All right. Sorry, yeah. First, under the Jersey case, the district court has the ability to comment on the evidence. And I think this was, maybe if it's comment on the evidence, it's within the district court's discretion. If it's comment on the law, it's an accurate description of the manual. The manual said that appointments must be made on merit, solely based on merit. Passing names, it's not just passing names. Mr. O'Brien could certainly pass names of people he thought would be good probation candidates. What he did instead was pass names of people who had very, he didn't himself pass the names, but people under him passed names of politically sponsored candidates. That's inconsistent with what the manual required, and therefore it is by definition questionable. It's questionable as a matter of law. It was also questionable as a matter of fact under the evidence because probation witnesses testified that they in fact questioned him. They objected. Ms. Slaney went to Ms. Tavares and complained that the most qualified candidate had been bypassed. And Ms. Tavares' response to that was sometimes the political thing had to be done. That's a reflection that this was a merit-based and it was questionable. And if this instruction was error, if it was an abuse of discretion, because again, the district court we think had discretion to comment on the evidence. If it was an abuse of discretion, it was harmless beyond a reasonable doubt because it just showed what the evidence showed. Judge Young, we recognize that he gave descriptions in this case, that his instructions were quite long, but I think that was warranted because this was a long trial. There were a lot of facts to cover. He wanted to keep the jurors focused on the issues at hand, and we think that the instructions did that without prejudice to the defendants. I know there are a host of issues in this case. I don't want to just pick one at random. If the court has questions about any specific issue, I would turn to that in particular. We think the evidence of Mr. O'Brien's guilt, certainly his intent to defraud, is overwhelming. But I would turn to, in this case, Mrs. Tavares, her criminal intent. I know that this requires reference to circumstantial evidence of a defense. Mrs. Tavares says in her reply brief that the government's brief is long on must-have notes. I think that's a fair characterization. But this isn't a maintenance standard. This is a criminal trial in which the jury gets to decide, gives their instance based on circumstantial evidence. That's the way you prove a conspiracy. To use as an example one of the particular false certifications, what evidence is there that she knew that that person didn't happen to be someone who fit the personnel standards better than anyone else? I don't think there's any particular evidence that she knew of any particular certification. The evidence that she knew of the certification process was through this Boston Globe response, where in 2010, yes, this is after the hires, but we didn't understand it can reflect back on what she would have known before. The reason she was charged with misresponse in the first place was because she was a senior official who was instantly familiar with the hiring process at all stages of the process. So let's assume that she knew that O'Brien wanted to make sure that when a legislature said, pick Joe, that Joe emerged from the process. Let's assume she knew that. How do you get from that to saying that when Joe got picked, she knew that the certification, that Joe didn't happen to emerge from the process just under normal course? I think the way we get at the particular requirements like that is through Pinkert. I think we have to prove the overarching conspiracy that she knows that the objective is to hire people who have politically favored sponsors, and then we get a particular point as to reasonable foreseeability. And then does that then depend on the government having evidence that each person picked was, in fact, not the most qualified? Does it have to depend on that? So I understand what you're saying. Because you're using the conceding that Pinkert's liability is necessary because you're conceding she wouldn't know whether that was the best person picked, which I think means that you're suggesting the actual person who committed the substance of the offense, not you, Pinkerton, did not have done what was not the most qualified. Again, I don't think that's the case, because then why do you think Pinkert's liability pertains to ours? Well, she has to know that the appointments are not based on merit. I mean, I think she has to say that if she knows that, then it's a theory that she can be guilty of welfare, even if the actual person appointed wasn't held on that. Yes or no? I don't think so. I think it's a no that I'm not required to say anything on this theory. Again, I would just back up to say that she knows what the certifications look like, because she's familiar with the process. She knows the certifications are false. She knows they're materially false. She knows they're in concession to the penalty of welfare, even when the person is hired, who is the most qualified. Yes. I think the answer is yes, because if Mr. O'Brien appointed the best candidate or the most qualified candidate by accident, that's not a defense. That's the Allard case. So if the state is getting something of sort of equal value to what it would have gotten under an appropriate procedure, that's not a defense, because the state didn't, you know, it wasn't getting the person it paid for in terms of the process. It didn't get the person. It just didn't get the process. Right. It got the exact person. How can that be a denial of property? Again, I think that I would refer to the Sorich case. If you say the person is having the right person get it is the property, but you also say having the process is also the property, then we've taken property and we've extended it to virtually everything. We've then taken mail fraud and incident and extended that, and we're left with any personnel decision made where you can allege and prove that the person wasn't truthful in why they selected the person becomes a federal criminal prosecution. I certainly think as any number of candidates in this case, and we've pointed them out in our brief, Lawton, McClain, Manchester, these were not the most qualified candidates at the time, so I don't think the court needs to go back to that. It depends on whether Tavares knew that. Well, I think she did know it as in Mr. Lawton and Ms. Manchester because people within the probation system came to her with complaints about these people. That amounted to sustaining all her convictions. It's enough to sustain two of her mail fraud convictions and her conspiracy conviction. And it would also sustain her racketeering. I think the answer is yes, except for two. Yes, they were. They were in 2008. So as long as those two are good, you're assuming that as long as the jury could find that she knew that was not the most qualified person, could find that was not the most qualified person, then all the convictions under her are good. Except for Melvin and Moskow. I don't think there's any direct evidence about what she knew or didn't know about the qualifications of those candidates. And the racketeering conviction would stand because there only needs to be two predicates. And the evidence that those two could not have been thought to be the most qualified is lack. Well, in Patrick Lawton's case, is it a question of what his qualifications were? Or is it a question of what she knew about what his qualifications were? I just didn't vote. The first is that Patrick Lawton was, at the time that he was hired, he had drug abuse issues, at least in his past. He was not nearly the highest. I think that his ranking within the second panel was something like 9th or 10th out of 13. I'm guessing as to what our brief says on this, but it's close to that. It's 8th or 9th or 10th out of 13 or 14 or what have you. Was the jury instructed that they had to find that the person hired was not the most qualified? I'm sorry? Was the jury instructed that they had to find the person hired was not the most qualified? No. So that must mean that Melvin thinks he's not Melvin. I think that's a kind of—well, I'm not going to be too crazy when I'm saying that it wasn't Melvin. Again, I have to anchor myself to what Soros says, which is it probably is an issue when you think you're paying for a merit-based candidate and you're not getting a merit-based candidate. Did you have a comment on the allegations made to the effect that the trial judge did not investigate a juror of this conduct? I think, yeah, I mean, I think the main—I don't want to characterize the defendant's argument on this point, but I think the one they had the most trouble with clearly was the juror who came to the court with a note and said, I would ask that the attorneys be mindful of their harassing and repetitive nature of their questions. I think the district court didn't need to inquire into that because the jury was warning her discomfort in the first person and it was directed at the attorneys. Is that the note that was typed? I think it was a handwritten note. There was one that was typed. It showed that it obviously had been prepared outside the juror room, anyway. Right. I think in my case, as to that, I don't think there's any evidence that the juror had communicated the content illegal if it wasn't investigated. Well, that's true, but I think there has to be some threshold showing that there would be a concern that the jury was talking about the case before it went to the jury—it was submitted to the jurors. I don't think that promissory showing was met under a detrimental abuse of discretion standard. And that's the material of this case. This is where the district court's discretion is at its absolute broadest. What about the meeting in the cafeteria? The meeting in the cafeteria, again, this is a—in this instance, a juror had brought in a companion, and the district court said that, so far as it was concerned, a juror can bring someone to court. The defendants haven't pointed to any other—excuse me, to any case law that says that you can't bring a companion to court, so long as you're not talking about the substance of the case. And the district court instructed the jurors every day not to talk about the substance of the case with anybody. If the juror was intent on speaking with somebody outside of court about the substance of the case, presumably he would do that without people who could see him, so he brings a person to court. Were there any indications that the jurors had been discussing the case? The only indication we think would be the district court characterized one note about requests for early transcripts, characterized that note as being from the jury rather than as being from a juror. The note itself and nothing else in the record that we can find suggests that it was from the jury as a whole, that they had collaborated about that, but the district court characterized it that way. So taking it that way, we would just say that a request for transcripts is akin to the Diaz case, for example, where jurors may have talked about a legal principle, but they weren't yet talking about the substance of the case as it related to the merits or as it related to whether the defendants were guilty or not. Unless your honors have further questions, we would ask you to affirm based on the arguments in our briefing today. Thank you. Thank you. Judge Bisgren, I think you have some time. Thank you. In terms of process and property, I'd like to just first note Cleveland, where the Supreme Court held that the deprivation of property was not the same as the deprivation of a regulatory interest, and there they said it was not a deprivation of property, even though there were false statements in applications for poker licenses, that what the state was deprived of was its opportunity to review a regulatory interest, not a property interest. So I think that in terms of deprivation, that you don't have the deprivation of property here. You also don't have the obtaining of property because the money was allocated before any hiring process was begun. The commissioners submitted a needs request to the CJAM, who approved the appropriation of funds before hiring was sufficient, and there's been no allegation that positions were not needed. So the property was already allocated by the time that the hiring process began, so there's no obtaining of property from the state by any fraudulent means. I'd like to go back to the manual standards and the notion that this is a complete merit-based, what a merit-based system is. First of all, political sponsorship doesn't mean that someone is unqualified or not the most qualified, even if you want to accept that. But the manual has as an objective hiring the most qualified in 4.100, 4.000. The only other provision that speaks of merit is the nepotism provision, captioned nepotism, that after saying it's the policy of the trial court that appointments be made solely on the basis of merit, and that goes on to the practice and appearance of nepotism or favoritism in the hiring process shall be avoided. You have to disclose relatives, and it goes on through kind of general nepotism provisions. Didn't you leave out a part of that provision that talks about it has to be based on merit? I said that at the very beginning. That was the first sentence. No, no, not the overall thing. In that 4.40, maybe I just misheard you. 4.000 doesn't state that. No, it was the nepotism provision. I thought nepotism, maybe I misheard you. 4.304. It says you have the policy of the trial court that all appointments be made solely on the basis of merit, the practice and appearance of nepotism. And favoritism is the first sentence. So how does the first sentence not, you say that only as you read it in the context of favoritism? I'm saying it's reading it in the context of favoritism. And what does favoritism mean in your view, then? I think favoritism for relatives. I'm just trying to say that between nepotism and favoritism, we're all talking about nepotism. I'm not sure that these manuals are necessarily on the standards of great English, but it seems it's captioned nepotism and nepotism generally understood as talking about hiring new relatives. Just the general notion that you read that manual, any provision of it, and come away with a conclusion that the way the probation officers is just ask the legislators who they want picked. That's how I define that. I don't think that's a fair description of the process. There was no allegation that the people who were hired were unqualified. There were. Sure, they're all qualified, but some were more qualified than others. That's the whole problem. That's the reason you have a selection process. Well, but the point is, this manual doesn't tell you how you make the determination. Sure, it tells you to make it on merit. But how? Merit is not defined. There is no objective test that has to be made. No, but it sure is not defined. Look at Mr. Lawton's hiring. Excuse me, Ms. Meister. When you're talking about hiring and you're talking about merit, aren't you basically saying that it's not going to be decided on those things we generally look at as not merit? And one of those is nepotism. Others is favoritism. And I don't see how you read all this and conclude that it's just going to be a patronage pool. Well, I don't think it's fair to characterize this as simply a patronage pool, where you have people who have gone through a screening process and have been viewed as qualified, and there is nothing you don't, there's nothing that says recommendations from legislators don't have substance to them. That's true. No one is suggesting that recommendations from a legislator disqualify you or can't be counted favorably if it goes to your qualifications and abilities. But the question is, are you saying that the manual is fairly read to say that as long as candidates meet the threshold of qualification, the trial court that issued that manual would have been different as to whether, as between those candidates, the only reason you were picked is because the Senate majority leader asked you to be picked? I don't know. I mean, just trying to say, your view is that the manual contemplated that being a plausible way of hiring unqualified candidates. I don't know what the manual contemplated. It was prepared before Judge Mulligan. All I'm saying is that it's fairly read. And it doesn't say that you can't, that it's impermissible to use that. And in terms of, just one moment, in terms of Mr. Lawton, Mr. Lawton's case was one that was actually reviewed by the CGEM, and he did approve that appointment. There was also one in which you had different members, you had Judge Mulligan saying that Mr. Lawton had a lottery, that that was a good criteria. You had someone on the judge panel saying she didn't think it was a good qualification. So, again, just an example of the lack of clarity and lack of standards for defining a merit or most qualified appointment. Thank you. Thank you. Thank you. As to the Rule 29 issue and as to the Lawton selection, for instance, Mr. Doris didn't have access to or know of a sponsor list, had no knowledge. Who would have referred Mr. Lawton if anyone did not sit at any interviews and either the second or third panel would not know how he scored? And for the government to say the principal evidence is somebody complained to her, complaints are not conclusive. Somebody could not think she was the best, most merited candidate, that he wasn't, without Ms. Tavares believing and sharing an intent for there to be a false certification. There was no other evidence of Ms. Tavares' knowledge of Lawton. Second is in terms of the letters. The government and I disagreed about what Hep-She requires. On defense brief 79, the critical quote from the Hep-She case of the circuit is, the males were in fact used in some manner to further such a scheme. The jury was not instructed on either the actual mailing or the furtherance requirement, which is a law that federalizes a state issue, is the mailing. And that shouldn't be left ambiguous. The jury shouldn't be allowed to guess. It's clearly not harmless error when, during today's discussion, there's real differences as to whether a rejection letter is or is not in furtherance of a scheme. The rejection letters in their appendix 84-76 are banal in writing. There's no factual misrepresentation. They're boilerplate. They're stamped with someone's signature. There's no evidence of a discussion. Let's send a rejection letter out. It's clearly a debatable issue as to whether or not the rejection letters do or do not satisfy the furtherance elements set by Hep-She as to male front. Can you just help me with what authority there is regarding the intent you have to have with respect to the furtherance form? Well, certainly for an 801a better, they would need to share the principal's intent, and the principal would need to have a purpose, a mens rea purpose, that this mailing carried out and furthered the male front. And Ms. Tavares' stamp was on it, so she is the principal in the individual accounts. And there's simply no evidence as to what her state of mind was or why she mailed or authorized the mailing of a rejection letter, except it's what people do to say nice things to people that don't get jobs. I know the government has another view, but absent an instruction requiring that the jury resolve this disputable issue, there's not harmless salary. Therefore, there should certainly be a reversal. And lastly, if I can get to it, this is a legal conspiracy case. It's not a 1349 case. You need to agree in a legal conspiracy that there be the commission of two acts, the commission of two mail frauds. Not some amorphous understanding, not some Pinkerton issue, but an agreement that two mail frauds, two false certifications be sent. There's no evidence that Ms. Tavares agreed to false certifications or shared in the intent or believed that Mr. O'Brien was falsely certifying anything to Chief Judge Mulligan. In a pre-scaling age, this would probably be a United Services case. But absent quid pro quo kickbacks and quid pro quo primaries, the government shows mail fraud as almost a default statute. And this is the case McDonald talks about, where there's amorphousness at the boundaries, where there's lack of clarity as to where the hiring decisions become federal crimes. And I would urge this court not to endorse the federal criminalization of essentially a state law hiring issue. Thank you very much. Your Honors, I have one minute, but I would like to get back to this declaration of property. The principal witness, the lead-off witness, Ellen Slaney, said that the hiring of individuals was within degrees of excellence. Every single candidate was within this degree of excellence. They were all qualified candidates. Now, the Sorich case, which my colleagues brought up repeatedly, the whole in that case was in terms of the property here the city paid for and was cheated out of qualified civil servants. That is not the case here, not at all. And I'd like to just also address one other point. This issue of Judge Young instructing the jury that the commissioner's communication to any designee where he could himself have sat on the judge's round panels was questionable and highly questionable, was not only highly prejudicial, it essentially denuded the defendants out of one of the central pillars of their defense. Thank you very much, Your Honors.